UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAUN HALL, individually and as co-successor-in-interest to Decedent MILES HALL; SCOTT HALL, individually and as co-successor-in-interest to Decedent MILES HALL,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF WALNUT CREEK, et al.,<br><br>    Defendants. | No. C19-05716 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT** |

**INTRODUCTION**

In this Section 1983 case arising from police shooting a disabled teen, plaintiffs move for leave to amend their complaint. For the reasons explained below, plaintiffs' motion to amend is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

This action arises from Walnut Creek police shooting and ultimately killing plaintiffs' mentally disabled son in the cul-de-sac outside their home. A prior order dismissed several of plaintiffs' claims and detailed the facts of this case (Dkt. No. 27).

Plaintiffs' proposed second amended complaint provides additional facts for each claim dismissed in the January 24 order. In relevant part, they now allege that prior to the shooting Walnut Creek police placed a hazard flag on plaintiffs' home for future service calls. After

plaintiffs called 911, dispatch informed responding officers that Miles Hall, the decedent, suffered from mental illness and that plaintiffs required their aid with his mental health crisis. Sergeant Holly Conners and Officer Tammy Keagy determined that Officer Keagy would contact Miles, establish a rapport with him, and de-escalate the situation. At some point prior to the shooting, Sergeant Conners assigned Officer KC Hsiao to carry a ballistic shield and Officer Matt Smith to carry the beanbag shotgun. After Sergeant Conners, Officer Hsiao, Officer Smith, and Officer Melissa Murphy arrived, they fanned out at the end of the cul-de-sac. At this point, Sergeant Conners physically gestured for Officer Murphy to hold her taser. Officer Smith made first contact with Miles and yelled for him to approach the officers. In response, Miles began jogging towards the officers. Both Sergeant Conners and Officer Keagy had extensive experience in de-escalating mental health issues and neither contacted nor instructed the less experienced officers to de-escalate (Dkt. No. 33-1 ¶¶ 18, 20, 25).

Plaintiffs also now allege that Walnut Creek's custom and training for taser usage remained restrictive to the point of rendering the taser ineffective in the field because officers could not use tasers on suspects moving, clothed, or armed. Walnut Creek's custom and training for taser usage departed from the industry-wide standard for the use of tasers. Also, Walnut Creek's custom and training for de-escalating mental health issues continued to be deficient. Lastly, plaintiffs allege that the officers' basis for depriving Miles of a reasonable accommodation under the ADA emanated from his mental illness (*id.* at ¶¶ 25, 37a, 38).

At a prior hearing for defendants' motion to dismiss, we learned that defendants had not yet made their initial disclosures, so we told defendants to provide initial disclosures in accordance with FRCP 26. This timely motion for leave to amend plaintiffs' complaint followed.

**ANALYSIS**

Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." Our court of appeals dictates consideration of four factors: (1) futility of amendment; (2) undue delay; (3) prejudice to the opposing party; and (4) bad faith. "These factors, however, are not of equal weight in that delay, by itself, is insufficient to justify denial

of leave to amend. A motion to make an amendment is to be liberally granted where[,] from the underlying facts or circumstances, the plaintiff may be able to state a claim." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). The court at its discretion may permit or deny a party the opportunity to amend a pleading. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Defendants oppose all of plaintiffs' amendments. This order will discuss each amendment in turn.

1. **FUTILITY.**

   A. **Integral participation claim.**

The January 24 order dismissed plaintiffs' integral participation claim against Officer Keagy for failing to allege meaningful participation by the officer (Dkt. No. 27 at 4). Plaintiffs now allege in their second amended complaint that "dispatch provided information that [Miles] suffered from mental illness" and that plaintiffs required their aid with his mental health crisis (Dkt. No. 33-1 ¶ 20).

Plaintiffs argue in their briefing that, leading up to the officers' arrival, Officer Keagy remained in radio communication with dispatch and Sergeant Conners. Plaintiffs additionally argue that Sergeant Conners, presumptively, assigned Officer Keagy to respond to the call, to communicate with the Hall family, and to update the other responding officers with what she learned from the family. Moreover, Sergeant Conners and Officer Keagy determined Officer Keagy would contact Miles and de-escalate the situation (Dkt. No. 33 at 7). These additional allegations result in plausibility of the integral participation claim against Officer Keagy. Thus, leave to amend plaintiffs' integral participation claim is not futile. This order reminds plaintiffs to put such allegations in their amended complaint.

   B. **Failure to intervene claims.**

The January 24 order dismissed plaintiffs' failure to intervene claims against Officer Keagy and Sergeant Conners for failing to allege the officers had a realistic opportunity to intervene before the fatal shooting and failed to do so (Dkt. No. 27 at 5). Plaintiffs' second amended complaint adds that Sergeant Conners and Officers Hsiao, Murphy, and Smith

3

"arrived and staged nearby and waited for [Officer] K[eagy] to arrive." Plaintiffs additionally add that Sergeant Conners "assigned [Officer] H[sia] to carry a ballistic shield, [Officer] S[mith] to carry the beanbag shotgun, and physically gestured . . . for [Officer] M[urphy] to remove her [t]aser and ready it for use" (Dkt. No. 33-1 ¶ 20). These additional allegations make it plausible that Sergeant Conners had a realistic opportunity to prevent Officers Hsaio and Murphy from shooting Miles.

This order must take a closer look at the facts plaintiffs allege against Officer Keagy, however, to determine futility. Plaintiffs allege that Sergeant Conners and Officer Keagy "determined that [Officer] K[eagy] would contact [Miles], establish a rapport with him and de-escalate the situation." Plaintiffs additionally allege Officer Keagy's physical presence at the scene when the other officers shot Miles. Plaintiffs alleged, however, in their prior complaint and continue to allege that Officer Keagy did not arrive until after Miles began jogging towards the other officers (Dkt. No. 33-1 ¶¶ 20, 25). Because the shooting occurred only moments later when Miles ran past the officers and after the shooting officers turned 90 degrees to their right, it remains highly improbable, based on the facts plaintiffs have alleged, that Officer Keagy had a realistic opportunity to prevent the shooting. These additional allegations fail to show that Officer Keagy plausibly had a realistic opportunity to intervene before the fatal shooting and failed to do so. Thus, it is futile to allow leave to amend plaintiffs' failure to intervene claim against Officer Keagy.

Therefore, leave to amend plaintiffs' claim for failure to intervene against Officer Keagy is **DENIED**.

### C. *Monell* claim.

The January 24 order dismissed plaintiffs' *Monell* claim for failing to plausibly allege (1) an official policy or widespread custom; (2) Walnut Creek's deliberate indifference to the officers' lack of training; or (3) authorization or ratification by an official with final policymaking authority (Dkt. No. 27 at 6–7).

*First*, plaintiffs' second amended complaint alleges that Walnut Creek not only had a custom of not using tasers on moving, clothed, or armed suspects but in fact, trained "its police

4

officers not to use [t]asers on suspects" moving, clothed, or armed. "This custom and training nullifie[d] the [t]aser and render[ed] it a useless tool to . . . officers . . . in the field" (Dkt. No. 33-1 ¶ 25). They argue that "rank and file officers" recognized these as well-known practices of Walnut Creek's police department (Dkt. No. 33 at 10). From these facts, plaintiffs plausibly plead a widespread custom.

*Second*, plaintiffs' second amended complaint alleges that had officers "been properly trained on how to use the [t]aser, they would have utilized it on [Miles] instead of resorting to deadly force" (Dkt. No. 33-1 ¶ 25).

In their briefing, plaintiffs argue that Walnut Creek's "custom and training effectively remove[d] the [t]aser from . . . officers' available tools, limit[ed] the amount of less lethal options that . . . officers ha[d] available, and encourage[d] . . . officers to use lethal force rather than less lethal options." Because "rank and file officers" knew these to be the well-known practices of Walnut Creek's police department, Walnut Creek and Chief Tom Chaplin knew of "these deficient practices." Plaintiffs argue that this "overly restrictive practice and training" with tasers departed "from industry-wide standards about the utility of [t]asers." Additionally, plaintiffs argue Chief Chaplin "personally sign[ed] off on all" training decisions for Walnut Creek police officers. They argue that since Walnut Creek did nothing to amend these deficiencies in training, Walnut Creek acted with deliberate indifference to the officers' lack of training (Dkt. No. 33 at 9–10). Because plaintiffs allege the lack of training for using tasers was widespread and known by "rank and file officers," the training departed from industry standards, and that Chief Chaplin personally signed off on all training decisions, Walnut Creek could reasonably be said to have been deliberately indifferent to the need for better training. From these additional facts, plaintiffs plausibly allege deliberate indifference. This order again reminds plaintiffs to place such allegations in their amended complaint.

*Third*, plaintiffs argue in their briefing that Chief Chaplin "personally sign[ed] off on all" disciplinary and training decisions for Walnut Creek police officers (Dkt. No. 33 at 10). From this fact we can plausibly find that Chief Chaplin knew his officers had received substandard training in the use of tasers and thus, approved of it.

5

In *Trevino*, however, our court of appeals refused to hold that the Los Angeles chief of police delegated final policymaking authority to rank and file police officers. *Trevino* found the city was not liable where police officers who shot the decedent were not "officials with final policymaking authority" and were not ordered to shoot by the police chief, the city council, or anyone else possessing final policymaking authority. *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). Plaintiffs' second amended complaint still fails to allege that Chief Chaplin, the city council, or anyone else possessing final policymaking authority delegated authority to any of the responding officers to engage in the alleged unconstitutional shooting. So, we cannot plausibly find that Chief Chaplin knew of the officers alleged unconstitutional use of force before it occurred and approved it.

Plaintiffs other amendments to their *Monell* claim, however, continue to be sufficient. Thus, leave to amend plaintiffs' *Monell* claim is not futile.

### D. ADA claim.

The January 24 order dismissed plaintiffs' ADA claim (1) for failure to "allege that Miles' disability caused his exclusion from benefits, denial of benefits, or discrimination" and (2) for failure to allege sufficient facts for deliberate indifference (Dkt. No. 27 at 9–10).

Title II of the ADA applies only to governmental bodies, like the City of Walnut Creek, and does not apply to law enforcement officers or other individuals. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001); *see also Updike v. Multnomah Cty.*, 870 F.3d 939, 954 (9th Cir. 2017). When a plaintiff brings a "direct suit under . . . Title II of the ADA against a municipality," however, "the public entity is liable for the vicarious acts of its employees." *Duvall*, 260 F.3d at 1141. Here, Walnut Creek remains vicariously liable for the actions of its police officers. Therefore, to determine Walnut Creek's liability under Title II of the ADA, this order must look to the acts of its police officers involved in the alleged unconstitutional shooting.

The second amended complaint plausibly alleges that Miles' disability caused the exclusion and denial of a reasonable accommodation under the ADA. Plaintiffs now allege the violation of Miles' rights "occurred by reason of his mental illness" and that Miles' exclusion

from benefits, denial of benefits, and discrimination against resulted "by reason of his mental disability" (Dkt. No. 33-1 ¶¶ 38, 45).

Plaintiffs argue in their briefing that Miles' mental disability caused the officers to arrive at his home, not because he committed any crime, rather because of his "mental health crises." They argue that, rather than being presented with a required reasonable accommodation under the ADA, officers presented him with a "comply or die posture." Because of his mental disability, officers had to offer him a reasonable accommodation dictated by the ADA, which they failed to do (Dkt. No. 33 at 11–13).

The second amended complaint alleges that prior to the shooting "Walnut Creek police placed a hazard on [p]laintiffs' home for future service calls" because of Miles' mental illness (Dkt. No. 33-1 ¶ 18). Plaintiffs explain in their briefing that the Walnut Creek Police Department placed a hazard on plaintiffs' address after police successfully effectuated a prior Section 5150 of California's Welfare and Institutions Code hold on Miles. A hazard meant that, in any future call from that address, three officers and a supervisor would respond to ensure that all officers knew the history associated with that address. Plaintiffs additionally allege that Sergeant Conners and Officer Keagy "determined that [Officer] K[eagy] would contact [Miles], establish a rapport with him and de-escalate the situation." Plaintiffs argue in their briefing that no responding officer followed this plan (Dkt. No. 33 at 2–3).

While the January 24 order determined the "factual allegations in plaintiffs' opposition" did not render leave to amend futile (Dkt. No. 27 at 10), the addition of only these facts still fails to render deliberate indifference at least plausible. These negate deliberate indifference. They show an effort to accommodate Miles — placing a hazard on his address, for example. The problem became negligence in execution of the accommodation, not deliberate indifference.

It should be noted that while the deliberate indifference standard here remains the same as the deliberate indifference standard under plaintiffs' *Monell* claim and plaintiffs allege both claims against Walnut Creek, each claim involves different rights. Plaintiffs, here, failed to allege sufficient facts to plausibly find deliberate indifference to Miles' statutory right under

Title II of the ADA, while plaintiffs plead facts to plausibly find deliberate indifference to Miles' constitutional rights under their *Monell* claim.

Thus, leave to amend plaintiffs' ADA claim is **DENIED**.

### E. Injunctive relief.

The January 24 order dismissed plaintiffs' equitable remedy of injunctive relief for failing to plead irreparable injury. Plaintiffs argue Walnut Creek must change its policies regarding the use of less-lethal force and de-escalation when detaining mentally ill suspects in need of mental health services. Plaintiffs argue they sufficiently allege in their amendments the existence of deficient "training, practices and policies" resulting in officers "failing to use reasonable less-intrusive alternatives to lethal force, failure to provide a reasonable accommodation under the ADA, and failing to reasonably use de-escalation tactics" thereby "killing people like" Miles. Here, plaintiffs make the same argument they made in their opposition to defendants' motion to dismiss: The threat of Walnut Creek police officers killing their only living child, their daughter, by failing to use less-lethal alternatives or de-escalation constitutes irreparable harm (Dkt. No. 33 at 13).

The answer to plaintiffs' query requires a brief explanation of case law. In *O'Shea*, a class of plaintiffs claimed they had been subjected to discriminatory enforcement of the criminal law. Although plaintiffs claimed that particular members of the class had actually suffered from the alleged unconstitutional practices, the United States Supreme Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." The prospect of future injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before" defendants. The Supreme Court could not find a case or controversy where the threat to plaintiffs failed to be "sufficiently real and immediate to show an existing controversy simply because they anticipate[d] violating lawful criminal statutes and being tried for their offenses." The Supreme Court further held that plaintiffs failed to establish "the basic requisites of the issuance of equitable relief in these circumstances — the likelihood of

8

substantial and immediate irreparable injury, and the inadequacy of remedies at law." It reasoned that the threatened injury continued to be far too conjectural and the available state and federal procedures could provide relief from the wrongful conduct alleged. *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 502 (1974).

In *Rizzo*, the plaintiffs alleged widespread illegal and unconstitutional police conduct aimed at minority citizens and against city residents in general. The Supreme Court reiterated the *O'Shea* holding: Past wrongs do not in themselves amount to a real and immediate threat of injury necessary to make out a case or controversy. There, the claim of injury rested upon "what one or a small, unnamed minority of policeman might do to them in the future because of that unknown policeman's perception" of departmental procedures. The Supreme Court held this claim to be "even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant [the] invocation of federal jurisdiction." *Rizzo v. Goode*, 423 U.S. 362, 372 (1976) (internal citations and quotations omitted).

In *Lyons*, the plaintiff asserted that "he may again be subject to an illegal chokehold" in support of seeking injunctive relief. The Supreme Court held that Lyons "failed to demonstrate a case or controversy with the [c]ity that would justify" the injunction sought because his standing depended on whether he would be likely to suffer future injury from the use of chokeholds by police officers. It reasoned that while Lyons may have been illegally choked by the police before, that event did nothing to establish a real and immediate threat that he would again be stopped for any offense by an officer who would illegally choke him into unconsciousness without any provocation or resistance on his part. The Supreme Court stated that for Lyons to have established a case or controversy, he "would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either[] (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or[] (2) that the [c]ity ordered or authorized police officers to act in such manner." It "is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions. The emotional consequences of a prior act simply are not

9

a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." In addition, the Supreme Court found that the "speculative nature of Lyons' claim of future injury" required finding the irreparable injury prerequisite of equitable relief unfulfilled. It stated that absent "a sufficient likelihood that [Lyons] will again be wronged in a similar way, [he] is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles v. Lyons*, 461 U.S. 95, 104–106, 107 n.8, 111 (1983) (internal citations omitted) (emphasis in original).

So too here. In order to establish an actual controversy in this case, plaintiffs would have to not only allege that they would have another encounter with the police but also the incredible assertion either (1) that all police officers in Walnut Creek always shoot and kill any citizen with whom they happen to have an encounter or (2) that Walnut Creek ordered or authorized police officers to act in such a manner. Plaintiffs here make neither allegation. Moreover, plaintiffs' basis for equitable relief continues to be far too speculative. It requires the presumption that when plaintiffs again make a 911 call to effectuate a Section 5150, or any other police action, that police officers will shoot and kill their remaining child. The United States Supreme Court has made it clear that such speculation will be insufficient to establish existence of a present, live controversy. As the *Lyons* Court would say, the emotional consequences of a prior act simply represent an insufficient basis for an injunction absent a real and immediate threat of future injury by the defendants. So, leave to amend remains futile.

Thus, leave to amend plaintiffs' equitable remedy of injunctive relief is **DENIED**.

2. **UNDUE DELAY.**

The second factor in determining the propriety of granting leave to amend is whether plaintiffs seek leave after undue delay. In general, diligence focuses on the time between the movant's discovery of new facts and its asking leave to file an amended pleading. *See Zivkovic v. S. Cal. Edison Corp.*, 302 F.3d 1080, 1087–88 (9th Cir. 2002).

At the hearing for defendants' motion to dismiss, we learned defendants had not yet given initial disclosures. We then reiterated the requirement of initial disclosures by defendants pursuant to FRCP 26. From this fact, there can be no doubt that plaintiffs' motion for leave to amend is timely. Oral arguments on defendants' motion to dismiss made clear that plaintiffs were denied initial disclosures until that day. Thus, there is no evidence of undue delay.

### 3. PREJUDICE AND BAD FAITH.

The third factor in determining the propriety of granting leave to amend is whether granting leave to amend would prejudice the defendant. In general, the "party opposing amendment bears the burden of showing prejudice." *DCD Programs*, 833 F.2d at 187. Our court of appeals denies leave to amend when new allegations "would totally alter the basis of the action." *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983).

Here, defendants make no prejudice argument for any of plaintiffs' amendments. Plaintiffs seek to amend already established claims. They do not allege any new claims. Moreover, none of plaintiffs' allegations would completely alter the basis of the action. Thus, plaintiffs' proposed amendments do not prejudice the defendants.

The last factor in determining the propriety of granting leave to amend is whether plaintiffs seek leave in bad faith. Nothing suggests plaintiffs seek leave to amend in bad faith, and defendants do not argue any bad faith on part of plaintiffs.

## CONCLUSION

Leave to amend plaintiffs' claim for failure to intervene against Officer Keagy is **DENIED**. Leave to amend plaintiffs' ADA claim is **DENIED**. Leave to amend plaintiffs' equitable remedy of injunctive relief is **DENIED**. Leave to amend all other claims is **GRANTED**.

Before filing, plaintiffs shall ensure their second amended complaint omits their claims for assault and battery against Sergeant Conners that were explicitly dismissed in the January 24 order and their ADA claim as well as their claim for failure to intervene against Officer Keagy and the equitable remedy of injunctive relief that are dismissed in this order. Plaintiffs

11

shall additionally ensure their second amended complaint includes the allegations argued in their briefing for their integral participation claim against Officer Keagy and for the deliberate indifference standard under their *Monell* claim.

**IT IS SO ORDERED.**

Dated: April 7, 2020.

WILLIAM ALSUP
United States District Judge